**AFFIRMED and Opinion Filed December 14, 2022**



**In The**
**Court of Appeals**
**Fifth District of Texas at Dallas**

_____

**No. 05-22-00634-CV**
_____

**IN THE INTEREST OF V.W. JR., A CHILD**

**On Appeal from the 196th Judicial District Court**
**Hunt County, Texas**
**Trial Court Cause No. 90770**

## MEMORANDUM OPINION

Before Justices Molberg, Reichek, and Garcia
Opinion by Justice Reichek

In this suit affecting the parent-child relationship, Mother appeals the trial court's final order appointing her sister and brother-in-law ("Aunt" and "Uncle") as managing conservators of her child, V.W., Jr. Mother asserts a single issue contending the evidence was legally and factually insufficient to support the jury's finding that appointment of Mother as sole managing conservator would significantly impair V.W., Jr's physical health or emotional development. We affirm the trial court's order.

## Background

Mother is the biological mother of four children: V.W., a girl, V.W., Jr., a boy, N.W., a boy, and L.M., a girl. At the time of trial, V.W was seventeen years old, V.W., Jr. was fourteen, N.W. was eleven, and L.M. was seven. In September 2020, the Department of Family and Protective Services (the "Department") filed a petition for protection of all four children seeking conservatorship or, alternatively, termination of Mother's parental rights. During the course of proceedings, the case pertaining to V.W., Jr. was severed and tried separately from the suit involving his siblings. This appeal addresses only the order of conservatorship of V.W., Jr.

The Department's involvement with Mother began in July 2020, when it received a report that L.M., who was five years old at the time, had tested positive for herpes. Mother and the children were sent to the Children's Advocacy Center where forensic interviews of the children were conducted. Mother met with Cassandra Marino, a Department investigator.

Marino questioned Mother about her relationships. Mother stated there had been domestic violence in her relationship with Father.[1] Aunt confirmed this at trial, stating that Mother's relationship with Father was abusive. Aunt testified that when she spoke with Mother on the phone, she could hear Mother and Father fighting and cursing at one another. Aunt further testified that Mother told her Father hit her and

---

[1] Father is the biological father of the three oldest children. Mother became pregnant with L.M. during a trip to Louisiana.

she saw Mother with bruises and scratches following an altercation with Father. At that time, Mother had only two children and Aunt attempted to move Mother and the children to her house to get them away from Father. After Aunt packed their things and took them to her house, Mother returned to Father the same evening. Aunt stated that, after this, Mother would no longer discuss any physical abuse she suffered because she did not want to leave Father. Father was eventually incarcerated on unrelated charges.

By July 2020, Mother was living with another man, Todd Chisolm. Aunt testified Mother brought Chisolm to her house in 2019 and introduced him as her boyfriend. Mother told Aunt she met Chisolm at a store and he was homeless. After taking Chisolm to a shelter a few times, Mother let Chisolm move in with her. Mother told her Chisolm had been in prison, but she did not know why. Aunt was concerned that Mother knew so little about Chisolm, and that she would be leaving the children alone with him while she was at work.

When Marino questioned Mother about Chisolm, Mother stated she had no concerns that Chisolm had sexually assaulted L.M. When Mother was told that L.M. made allegations against Chisolm in her forensic interview, she continued to deny that any abuse by him had occurred. Marino also discussed allegations with Mother that her older daughter, V.W, had been sexually abused. Marino stated that, when V.W. was twelve years old, she was involved in a sexual relationship with an older

boy. Mother told Marino she allowed the relationship between V.W. and the boy to continue because the sex was consensual.

The children were removed from Mother's home that day. Mother continued to live with Chisolm for several more weeks until he physically attacked her by choking her, beating her head against a wall, and slashing her face with a knife. After that, Mother moved to a shelter.

Following a hearing, Mother was ordered to perform a variety of services, including a parenting program addressing sexual abuse, a domestic violence program, and family counseling. Mother was able to move back into an apartment and complete most of the programs within a few months. Mother's progress was sufficient that the Department began allowing some of the children to return to living with her. By the end of August 2021, three of the children, V.W., N.W., and L.M. were placed with Mother while being monitored by the Department. V.W., Jr. lived with Aunt and Uncle.

The Department remained concerned about permanently returning the children to Mother, given that Mother would still occasionally deny that Chisolm sexually abused L.M. and frequently failed to cooperate with Department members. Mother continued to deny that Chisolm abused L.M. even though Mother knew Chisolm had herpes and she had also contracted herpes from him. After the third child was placed in Mother's home, the situation began to deteriorate.

Denica Diaz, a conservatorship caseworker for the Department, testified that when she confronted Mother about issues involving the children, Mother would become extremely angry and, at times, aggressive. Katrina Luallen, the court appointed special advocate for the children, testified that, in her interactions with Mother, Mother would yell, scream, and curse at her. Mother would also either avoid answering questions or give answers that were evasive. Luallen stated she had consistent difficulty scheduling visits and Mother would frequently not show up. On one occasion, Luallen knocked on Mother's door for ten to fifteen minutes because she saw Mother's car parked in front of the apartment building. When Mother did not answer, Luallen called Diaz and the police. After the police arrived, they continued banging on the door in an attempt to get Mother to answer. Mother later said she heard them, but they did not give her time to get to the door. When Luallen told her they were knocking on the door for forty-five minutes, Mother responded that she refused to open the door because they were being disrespectful.

On another occasion, Luallen went to Mother's apartment and waited outside for her to come home. When Mother pulled up in her car, a man got out of the passenger's side, removed a duffle bag from the trunk, and went into the apartment with Mother. Luallen later questioned Mother about what she saw and Mother denied that it happened saying there was "no man."

During that same time, Diaz was having problems conducting home visitations. She stated Mother would not let her into certain areas of the house. At

one point, Mother would not let her look in the primary bedroom closet. When Diaz told her she needed to see behind every door, Mother opened the closet door a few inches and flicked the light on and off saying "See, see, it's just stuff. Can't you see?" Mother had never prevented Diaz from looking in the closet before, and Diaz stated the closet was large enough to hold a person. When Diaz arrived for another visit, she saw the apartment lights go off and no one answered the door.

Because of Mother's conduct, the Department determined it was no longer willing to work with her towards permanent reunification with the children. Although the Department decided it would not seek to terminate Mother's rights as a parent, it requested that she be named only a possessory conservator. In the case of V.W., Jr., the Department requested that Aunt and Uncle be named managing conservators.

V.W., Jr. testified at trial. He stated it was his wish to continue to live with Aunt and Uncle. According to V.W., Jr., living with Mother made him feel worried and stressed because he never knew what was going to happen next. He testified he heard Chisolm verbally abuse Mother on a regular basis and he worried he would have to step in to protect her. When he was living with Mother, he avoided being at home and would go to a friend's house or an after school program. V.W., Jr. characterized Aunt and Uncle as very supportive, kind, loving, and responsive to his needs. They helped him with his school work, went to his basketball games, gave him a savings account, and taught him to manage money. V.W., Jr. said he thought

Aunt and Uncle were preparing him for the future and Uncle was a great role model. V.W., Jr. wished to continue his relationship with Mother through visits. Because, Mother moved to an apartment only a few blocks away from Aunt and Uncle, he stated he would be able to see her frequently.

Aunt testified that when V.W., Jr. first came to live with them he was small for his age and withdrawn. He told her he "wasn't used to eating a lot" and had to share food with his siblings. Aunt said she encouraged him to eat more and cooked his favorite meals. After a while, V.W., Jr. "hit a growth spurt" and began "eating everything."

Aunt stated that, at first, V.W., Jr. would "shut down" when asked about family issues. After he had an unsupervised visit with Mother, V.W., Jr. became angry and disrespectful. Aunt noted that V.W., Jr. was only disrespectful to her, and she was concerned that this was because he had seen how men treated Mother. It was later determined that V.W., Jr. had left Mother's apartment to stay with a friend during the visit. After they took V.W., Jr. to counselling, Aunt stated he was able to open up and "wasn't struggling with what [he] should say anymore" about his family. Luallen testified that, since living with Aunt and Uncle, V.W., Jr. had become much more open and expressive.

Following the unsupervised visit with V.W., Jr., Mother brought her three other children to Aunt's house to discuss things. Aunt stated Mother became upset and started cursing and yelling in front of the children. Aunt asked Mother to leave

and Mother screamed and cursed till she left the house. The children remained with Aunt, unsure of what to do. Aunt said this was not the first time that this type of outburst had occurred. According to Aunt, Mother had previously gone so far as to threaten to kill herself in front of the children.

Aunt was concerned that if Mother was given custody of V.W., Jr., he would be living in an unstable environment. Aunt stated she had not seen any positive improvement in Mother during the pendency of the case. Because Mother was generally unresponsive to offers of help, and combative when confronted about problems, Aunt was afraid she would not be able to help V.W., Jr. if he went back to Mother.

Diaz also opined that Mother had not shown any positive improvement since the children were removed. Although Mother completed many of the court ordered services, Diaz did not observe any behavioral changes. Even after finishing the sexual assault program, Mother continued to deny that L.M. was sexually assaulted. Diaz stated Mother never took personal responsibility for the things that had occurred, and she continued to blame others or external circumstances for her problems.

Luallen stated that Mother shuts down when things are difficult and feels no sense of urgency to meet the children's needs. During the pendency of the case Mother and the children moved from Hunt County to Denton County and, despite repeated requests by the Department, Mother had not taken L.M. to counselling since

the move. Luallen also told Mother there was a concern raised by the maternal grandmother that L.M. was watching pornography on electronic devices. Mother denied it was an issue. Because of Mother's apparent unwillingness to address issues or change her behavior, Luallen was concerned V.W., Jr. would learn to repeat those behaviors, and that he would be exposed to people who would pose a danger to his physical or emotional development.

Mother was called as a witness at trial. She testified in person on the first day of trial, and testified via Zoom on the second day. Mother left part way through her questioning on the first day because she had not made arrangements for child care. On the second day, Mother became upset within the first few minutes of questioning and, after an outburst including profanities, disconnected from the proceeding. Trial continued for several more days, but Mother never returned. Upon motion made by the Department, Mother's testimony was struck and the jury was instructed not to consider it.

After hearing the evidence, the jury returned a verdict naming Aunt and Uncle as V.W., Jr.'s managing conservators. Mother was named as a possessory conservator.[2] Mother timely brought this appeal.

---

[2] Father was also named a possessory conservator. He has not appealed the trial court's order.

**Analysis**

A jury's verdict regarding conservatorship is binding on the trial court and entitled to substantial deference on appeal. TEX. FAM. CODE ANN. § 105.002(c); *Danet v. Bahn*, 436 S.W.3d 793, 796 (Tex. 2014). In reviewing the jury's verdict, we apply the ordinary evidentiary review for legal and factual sufficiency. *Danet*, 436 S.W.3d at 796. Evidence is legally insufficient if the record shows: (1) a complete absence of evidence of a vital fact, (2) rules of law or evidence bar the court from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a scintilla, or (4) the evidence conclusively establishes the opposite of the vital fact. *Id*. at 797. Evidence is factually insufficient if it is so against the great weight and preponderance of the evidence that it is manifestly unjust, shocks the conscience, or clearly demonstrates bias. *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002); *Pool v. Ford Motor Co*, 715 S.W.2d 629, 635 (Tex. 1986). Where no party objected to the jury instructions given, we review the sufficiency of the evidence in light of those instructions. *Danet*, 436 S.W.3d at 796.

The court's charge in this case included the following relevant instructions:

> The best interest of the child shall always be the primary consideration in determining questions of managing conservatorship and questions of possession and access to a child. Some factors to consider in determining the best interest of the children are:

> 1. The desires of the children.

–10–

2. The emotional and physical needs of the children now and in the future.

3. Any emotional and physical danger to the children now and in the future.

4. The parenting ability of the individuals seeking custody.

5. The programs available to assist those individuals to promote the best interest of the children.

6. The plans for the children by those individuals or by the agency seeking custody.

7. The stability of the home or proposed placement.

8. The acts or omissions of the parent that may indicate that the existing parent-child relationship is not a proper one.

9. Any excuse for the acts or omissions of the parents.

. . .

A parent shall be appointed permanent managing conservator, in preference to the Texas Department of Family and Protective Services or a family relative, unless appointment of a parent as managing conservator would not be in the best interest of the child because the appointment would significantly impair the child's physical health or emotional development.

The burden of showing that the parent's appointment as managing conservator would result in significant impairment to the child is borne by the non-parent seeking conservatorship. *In re F.E.N.*, 579 S.W.3d 74, 77 (Tex. 2019). Such proof should include the acts and omissions of the parent demonstrating that result. *Id.* Conduct by the parent occurring in the years immediately before trial, together with evidence of the child's bond with the caretaker with whom they were placed due to the parent's conduct, may constitute some evidence to support a finding of significant

–11–

impairment to the child's physical health or emotional development if the child were returned to the parent's custody. *Danet*, 436 S.W.3d 797–78; *In re S.T.*, 508 S.W.3d 482, 492 (Tex. App.—Fort Worth 2015, no pet.). Although evidence of past misconduct, standing alone, may not be sufficient to show the present unfitness of a parent to be managing conservator, a factfinder may infer present unfitness from the parent's recent, deliberate misconduct. *In re A.V.*, No.05-20-00966-CV, 2022 WL 2763355, at *6 (Tex. App.—Dallas July 15, 2022, no pet.) (mem. op.). Considerations when deciding conservatorship include, among other things, parental irresponsibility, bad judgment, child abandonment, and an unstable, disorganized, and chaotic lifestyle that has put, and will continue to put, the child at risk. *In re S.T.*, 508 S.W.3d at 492. The parent's treatment of other children may also be relevant. *Id*.

In her brief on appeal, Mother does not generally challenge the jury's determination that naming Aunt and Uncle managing conservators of V.W., Jr. is in V.W., Jr.'s best interest. She asserts only that the evidence is legally and factually insufficient to show that naming her as managing conservator would significantly impair V.W., Jr.'s physical health or emotional development. She argues "no evidence was produced by the Department explaining how any of [her] choices or conduct would contribute to significant impairment of the child's emotional development were he to be placed in [her] custody."

Contrary to Mother's assertion, the evidence produced by the Department showed that Mother's choices and conduct subjected her children to an unstable, unsafe, and sometimes violent home environment. The evidence further showed that Mother did not prioritize her children's welfare and safety, and she gave no indication of a willingness to accept responsibility for her choices or change her behavior. *See In re D.W.*, 445 S.W.3d 913, 932 (Tex. App.—Dallas 2014, pet. denied).

Mother had a pattern of relationships with abusive men and of exposing the children to the abuse. She refused to leave the man who sexually abused her daughter until he physically attacked her. V.W., Jr. stated he felt stressed living with Mother because he never knew what was going to happen and he worried he would have to protect her. At a time when the Department was monitoring Mother's ability to provide the children with a safe environment, Mother again brought an outside party into the home and lied to the Department about it. Because of Mother's refusal to accept responsibility for actions that endangered the children, or acknowledge the resulting injuries to the children, the jury could reasonably conclude her pattern of bringing abusive or unstable people into the home would continue.

Mother did not provide V.W., Jr. with good role models, and was not a good role model herself. Throughout the pendency of the case, Mother was uncooperative, unresponsive to counselling, secretive, and prone to angry outbursts. Aunt testified that, after spending time with Mother, V.W., Jr. would be withdrawn

and behave disrespectfully towards her. In contrast, the evidence showed that after living with Aunt and Uncle for two years, V.W., Jr. showed significant growth both physically and emotionally. It was V.W., Jr.'s wish to remain living with Aunt and Uncle and he stated they were more responsive to his needs.

Finally, the evidence showed Mother failed to protect her children. She allowed her oldest daughter to engage in a sexual relationship at the age of twelve. She later refused to believe her younger daughter was sexually abused even after she was informed of her daughter's outcry and presented with proof that she had contracted a sexually transmitted disease. Mother refused to address issues regarding the children's welfare and resisted the Department's efforts to ensure their home environment was safe and appropriate. Safety, security, and stability are critical to a child's development. *In re R.T.K.*, 324 S.W.3d 896, 903 (Tex. App.—Houston [14th Dist.] 2010, pet. denied). We conclude the evidence was both legally and factually sufficient to support the jury's finding that appointment of Mother as managing conservator would significantly impair V.W., Jr.'s physical health or emotional development.

We overrule Mother's sole issue and affirm the trial court's order.


/Amanda L. Reichek/
AMANDA L. REICHEK
JUSTICE

220634F.P05

–14–



# Court of Appeals
## Fifth District of Texas at Dallas
## JUDGMENT

IN THE INTEREST OF V.W., JR., A CHILD

No. 05-22-00634-CV

On Appeal from the 196th Judicial District Court, Hunt County, Texas Trial Court Cause No. 90770. Opinion delivered by Justice Reichek. Justices Molberg and Garcia participating.

In accordance with this Court's opinion of this date, the order of the trial court is **AFFIRMED**.

Judgment entered December 14, 2022